## UNITED DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **LESBELIA RESENDES,** | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | )     **Civ. Action No. 09cv11044-NG** |
| **MICHAEL J. ASTRUE,** | ) |
| **COMMISSIONER OF** | ) |
| **SOCIAL SECURITY,** | ) |
| **Defendant.** | ) |

**GERTNER, D.J.:**

## MEMORANDUM & ORDER
February 17, 2011

## I.    INTRODUCTION

Plaintiff Lesbelia Resendes ("Resendes") appeals from the denial of her application for Social Security Disability Insurance ("SSDI") benefits by the Social Security Administration ("SSA"). Resendes's appeal presents two main arguments: First, that the Administrative Law Judge ("ALJ") erred in finding that Resendes' emotional and cognitive problems did not constitute a "severe" impairment. Second, that the ALJ's assessment of her Residual Functional Capacity ("RFC") was not supported by substantial evidence because it was based on a flawed credibility finding and medical reports that did not focus on the relevant time period.

I agree that the ALJ's conclusion that Resendes' mental impairments were not severe was not supported by the medical record as a whole. I also concur that the ALJ's RFC assessment was not supported by substantial evidence for three reasons: (1) the ALJ did not provide sufficiently specific reasons for his adverse finding as to Resendes' credibility; (2) the evidence on record was insufficient to support reasonable conclusions as to Resendes' capabilities during the relevant time period; and (3) the ALJ's RFC assessment did not consider the impact of Resendes' headaches on her ability to work. Consequently, Plaintiff's Motion for Order

Reversing the Decision of the Commissioner **(document #13)** is **GRANTED,** and the

Defendant's Motion for Order Affirming the Decision of the Commissioner **(document #15)** is

**DENIED.** I also **REMAND** the claim back to the Commissioner for further proceedings so that

an accurate RFC assessment can be made.

## II.    FACTUAL BACKGROUND

Resendes was born on August 25, 1954, in Azores, Portugal. Administrative Record

("A.R.") at 21, 118 (document #9). She was 46 years old on the date of onset of her alleged

disability, and 47 years old on the date she was last insured. See id. at 21. Resendes' first

language is Portuguese, but she is able to communicate in English. Id. at 21, 118. She obtained

a General Education Diploma in the United States. Id. at 118. Prior to the onset of her alleged

disability, Resendes worked as a lab technician handling rubber automobile parts. Id. at 21.

Resendes filed an application with the SSA for SSDI benefits on September 8, 2005. Id.

at 44-53. A claimant is entitled to SSDI benefits if, among other things: (1) she meets the

"insured status" (achieved by making sufficient contributions to the Social Security system via

payroll taxes to qualify for coverage, as set forth in 42 U.S.C. § 414); and (2) prior to the

expiration of that status, was under a disability that lasted, or could be expected to last, for a

continuous period of at least twelve months. 42 U.S.C. § 423(a)(1)(A) & (C); see also Coughlin

v. Astrue, 2010 WL 4225380, at *2 (D. Mass. 2010). The date Resendes last met the insured

status requirements ("date last insured" or "DLI") was September 30, 2001. A.R. at 13.

Resendes' original application for SSDI benefits alleged that she had been disabled since

December 18, 1992, the date that she first began experiencing serious medical problems, namely,

breast cancer. See id. at 44. However, she subsequently amended her onset date to January 1,

2001, to reflect the time when she began experiencing the specific medical problems alleged in her application. See id. at 817. Thus, Resendes has the burden of proving that she was disabled between the period of January 1, 2001 and September 30, 2001.

Resendes' claim was initially denied and was also denied upon reconsideration. Id. at 37-39, 41-43. She requested a hearing before an ALJ to review the decision, which was held on June 15, 2007. Id. at 36, 814. On August 6, 2007, the ALJ issued his decision affirming the denial of benefits. Id. at 9-22. The denial of benefits became final on May 15, 2009, when the Decision Review Board affirmed the ALJ's decision. Id. at 4-7. Resendes filed an appeal in District Court on June 15, 2009.

## A.     Resendes' Medical History

Resendes' medical history is long and troubled. The administrative record includes treatment notes and evaluations, but few of these were created during the relevant time period of January 1, 2001, to September 30, 2001. For ease of analysis, Resendes' impairments can be grouped into three basic categories: (1) her headaches, (2) her other physical impairments, and (3) her mental impairments.

### 1.     Resendes' Headaches

Resendes first began complaining of headaches in the early nineties. At that time, she was prescribed various medications for the pain, but testing found no brain abnormalities. Id. at 96-97. In October 2000, in response to persistent headaches, Resendes underwent an MRI of the brain to rule out an acoustic neuroma or stroke. Id. at 444-45. The MRI was inconclusive, particularly because it could not readily be compared with an MRI conducted eight years prior,

which was apparently performed with less-advanced technology.  Id.  There was no evidence of an acute infarction or any other abnormality.  Id.

On January 19, 2001, Resendes was admitted to the emergency room at St. Luke's Hospital complaining of nausea and headaches lasting for two days.  Id. at 347.  She was in "mild to moderate distress," but did not exhibit any visual or focal neurologic symptoms.  Id. She underwent a CT scan, which was negative.  Id. at 349.  She was diagnosed with acute gastroenteritis, given IV fluids, and discharged later that same day.  Id.  At the administrative hearing, Resendes claimed that she experiences migraine headaches up to five times per week, with such intense pain that she becomes nauseous.  Id. at 830.

## 2. Resendes' Other Physical Impairments

Resendes suffers from a host of other physical problems, including carpal tunnel and arthritis in her hands, residual pain from surgery on her foot/ankle, and pain in her shoulder, back, and neck.  In 1992, Resendes underwent surgery to alleviate pain in her right hand and wrist associated with a nerve injury and carpal tunnel; by her surgeon's account, she made a full recovery.  Id. at 121, 128, 130-31.  However, on September 27, 2001 during a visit with her primary care physician, Dr. Robert Caldas, D.O., Resendes complained of pain and stiffness in her hands, and swelling of her joints so severe that she would have to pry her fingers apart from a clenched position.  Id. at 455.  She also complained of similar symptoms in her toes.  Id.

At the administrative hearing, Resendes testified that the carpal tunnel and arthritis in her hands has caused her joints to become "crooked" and causes her hands to lock up.  Id. at 828-29. Resendes testified that her husband does most of the cooking because pain in her hands prevents her from doing so.  Id. at 827.  She recalled a specific incident in which she almost scalded

herself with hot soup because she dropped the pan due to stiffening in her hands.[1]  Id. at 827-28.
Resendes testified that her niece has to help her clean the house because she can't scrub or dust
due to the pain and stiffening in her hands.  Id. at 828.

With respect to Resendes' foot and ankle issues, in 1998, Resendes suffered a fracture in
her right foot after falling down a flight of stairs.  See id. at 172.  She underwent surgery to
repair it in April of that year.  Id.  The recovery from the surgery was difficult.  See id. at 160.
Resendes had another surgery (a "subtalar arthrodesis") on her right ankle in November 1999.
Id. at 705.  She recovered quickly, and six weeks later her doctor reported that "her foot looks
excellent."  Id. at 707.  A year later, Resendes reported swelling and pain in that foot,
particularly after one night when she did "some dancing."  Id. at 710.  A CT scan revealed a
"bony fusion" across her subtalar joint.  Id. at 711.  Her doctor recommended physical therapy.
Id. at 711.  In February 2001, Resendes went for a follow-up visit concerning the status of her
foot and ankle post-surgery.  Id. at 712.  Her doctor reported that Resendes was doing "quite a
bit better," and that the physical therapy had helped Resendes "a great deal."  Id.  In 2002,
Resendes saw an orthopedist again complaining of pain in her foot that she had experienced
since her surgery.  Id. at 156.  At the administrative hearing, Resendes testified that her foot pain
is so severe that her foot cramps up "in a claw," and her husband has to massage it to make the
pain subside.  Id. at 829.  She testified that she cannot walk more than five to ten minutes at a
time.  See id. at 830, 835.

---

[1] Resendes' husband, Angelo Resendes, also testified at the hearing and corroborated Resendes' assertions.  A.R. at
843-48.  He said he did not allow Resendes to cook because she drops things and had almost burned herself.  Id. at
843-44.  He said that because of her reduced hand function, he had to open cans and bottles for his wife.  Id. at 844.
However, he said she could control a knife and fork and very carefully carry a plate, if necessary.  Id. at 847.

In addition to her foot problems, Resendes began complaining of shoulder and neck pain in 2001. She continued to experience pain in her neck and shoulder through 2005. See id. at 149. Resendes underwent several MRIs to determine the cause of this pain, which revealed mild spondylosis and disc bulges. Id. at 752-54, 756-59. At the administrative hearing, Resendes testified that she has to alternate between sitting and lying down throughout the day to alleviate the pain in her neck. Id. at 833.

In 2005, Resendes' medical records were reviewed by Beth Schaff, M.D., a non-examining physician who completed a Physical RFC Assessment to be used in connection with Resendes' disability hearing. Id. at 211-18. Dr. Schaff concluded that Resendes could: occasionally lift up to twenty pounds; frequently lift up to ten pounds; stand and/or walk for three to four hours in an eight-hour workday; sit for a total of six hours in an eight-hour work day; push, with unidentified limitations in her upper and extremities; climb, balance, stoop, kneel, crouch, and crawl occasionally; occasionally reach overhead; occasionally perform repetitive grasping and twisting; and, perform unlimited fingering (fine manipulation) and feeling. Id. at 212-14. Dr. Schaff's assessment was made part of the record for the ALJ to review, but no live testimony was presented.

### 3. Resendes' Mental Impairments

In addition to her physical ailments, Resendes also suffers from mental impairments -- both emotional problems, in the form of anxiety and depression, and cognitive problems, in the form of difficulty remembering and concentrating. One examining physician opined that Resendes' memory deficits and difficulty concentrating might result from her battle against breast cancer, for which she was diagnosed in 1992. Id. at 111. Among other things, the cancer

and its treatment caused Resendes to undergo menopause in her mid-40s.  Id. at 111, 116.  Her hormonal imbalance may have led to the cognitive difficulties of which she would later complain, but she was prohibited from undergoing hormonal therapy as it would interfere with her cancer treatment.  Id. at 111.

The record reflects that Resendes first complained of severe memory and concentration problems in 1999.  In October 1999, Resendes underwent a neuropsychological evaluation performed by neuropsychologist Mary-Ellen Meadows, Ph.D., who administered numerous diagnostic tests.  Id. at 117-20.  On two tests for intellectual ability and vocabulary, Resendes performed well below average, in the 10th and 8th percentiles, respectively.  Id. at 118.  Resendes tested in the "low average range" on tests for her auditory and spatial attention spans.  Dr. Meadows opined that Resendes was in the "mild to moderate range of depression."  Id. at 120.  Dr. Meadows also concluded that Resendes intellectual abilities were in the "low average range" and that her memory was in the "average range."  Id.  She hypothesized that these results might have been caused by any number of Resendes' conditions, including small vessel disease, estrogen deficiency, her cancer treatment, or her "affective state."  Id.  However, she observed that "[Resendes' affective state] alone cannot account for the breadth of present findings."  Id.

In 2005, Resendes also saw psychologist Leonard Bard, Ph.D. for an evaluation requested by the state disability office pursuant to her SSDI application.  Id. at 219-24.  Dr. Bard observed that Resendes had difficulty concentrating during testing.  Id. at 223.  He noted that "at present time, [Resendes] appears to be suffering from a depressive and an anxiety disorder, but her primary difficulties appear to lie in memory," as testing indicated that her impairments were "moderate to severe."  Id.  Dr. Bard opined that "[i]f awarded benefits of Social Security

Disability. . . . Ms. Resendes would be incompetent to manage her funds independently at the present time because of her severe memory problems." Id. at 223-24.

Lauren E. Pollak, Ph.D. administered a follow-up neuropsychological evaluation of Resendes in January 2006. Id. at 446-50. Dr. Pollak concluded that Resendes' difficulties in executive functioning could be characterized as "mild in severity." Id. at 449. She noted that Resendes performed identically on diagnostic tests administered in 1999. Id. She remarked that "memory continued to emerge as an area of relative strength on testing, with her memory scores falling in the low average and average range." Id. at 449-50. In particular, she noted that "despite Mrs. Resendes's impression that her memory problems have progressively worsened since 1999, there was no objective evidence from the current evaluation to clearly support a cognitive decline." Id. at 450.

At the administrative hearing, Resendes testified as to the impact of her cognitive problems on her ability to work. She testified that she tried to return to work on a part-time basis in 1994, after she had completed her chemotherapy. Id. at 821-22. Resendes explained that even though she had been put on "light duty," which involved doing paperwork, she still could not complete her work because she just couldn't concentrate. Id. at 822. Resendes testified that her inability to concentrate also forced her to abandon her volunteer work reading to patients at St. Luke's Hospital. Id. at 823.

Resendes brought index cards to the hearing in order to help her remember dates and the names of her doctors; she claimed that without her note cards she forgets her appointments and other obligations, and that even with the note cards she still has difficulty remembering. Id. at 832. She explained that, due to her memory problems, she could no longer manage her checking

account and that she "screwed up the bills." Id. at 824. Resendes claimed that she could not

concentrate well enough to watch a full-length movie or process a full article in the newspaper.

Id. at 832.

Regarding Resendes' emotional problems, in 2005, Dr. Susan E. Sullivan, Ph.D.

completed a psychiatric disorder worksheet for the SSA, based on her treatment notes[2] for

Resendes from the years 1992 to 2001. Id. at 137-39. At the time Dr. Sullivan completed this

report she had not examined Resendes in four years. Dr. Sullivan diagnosed Resendes with

"dysthymic disorder," a long-term moderate form of depression.[3] Id. at 137. However, she

opined that Resendes had a Global Assessment of Functioning ("GAF") score of 70, id., which is

indicative of "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some

difficulty in social, occupational, or school functioning . . . but generally functioning pretty well,

has some meaningful interpersonal relationships."[4] See American Psychiatric Association,

Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 34 (4th ed. 2000). Dr.

---

[2] The record includes Dr. Sullivan's psychiatric disorder worksheet, but not the treatment notes that they were based on.

[3] A person suffering from a dysthymic disorder is characterized by a "chronically depressed mood, most of the day, more days that not, over 2 years. . . . [the individual] may present with insomnia, appetite problems, fatigue, poor concentration. DSM-IV, 376-381.

[4] The GAF Scale is found in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") published by the American Psychiatric Association. "A GAF score represents 'the clinician's judgment of the individual's overall level of functioning. The GAF score is taken from the GAF scale, which 'is to be rated with respect only to psychological, social and occupational functioning.' The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death." Annaloro v. Barnhart, 2004 WL 1529260, at *3, n.5 (D.Me. 2004) (quoting DSM-IV, text review) (internal citations omitted).

A GAF score in the 61-70 range "is consistent with not more than mild symptoms or impairment of social function." Noyes v. Astrue, 2008 WL 2484848, at *3, n.6 (D. Mass. 2008) (internal quotations omitted). Persons with a GAF in that range might have "possible difficulty in occupational or social functioning, but generally functio[n] fairly well." Pina v. Astrue, 2007 WL 2071791, at *1, n.2 (D. Mass. 2007).

Sullivan reported that she was unable to form an opinion as to Resendes' mental status, concentration, or attention span as of 2005, but claimed that she had not observed any deficits in these areas "during [the] 1990s." A.R. at 137-39. She concluded that Resendes' prognosis was "good when I worked with her in [the] 1990s [and] early 2000s." Id. at 139.

In February 2003, Resendes was assessed at the New England Child and Family Services' ("CFS") emergency psychiatric stabilization unit in New Bedford. A mental health counselor diagnosed her with Major Depressive Disorder, and found that her GAF at admission was 50[5] ("serious symptoms"), although it was expected to be 68[6] at discharge. Id. at 174. Social worker Barbara Beckman from CFS served as Resendes' primary therapist from March 2003 to February 2006, and saw Resendes regularly during that time period. Id. at 179-94, 433. During this period, doctors at CFS prescribed Resendes several anti-depressants and sleep aids, including Celexa, Trazodone, Seroquel, and Xanax. Id.

In addition to providing treatment records, Barbara Beckman ("Beckman"), a licensed clinical social worker, wrote a report to be used in connection with Resendes' disability hearing. Id. at 431-33. The report is undated, but covers the period from March 2003 to February 2006. Id. at 431. Beckman repeated her diagnosis that Resendes suffers from a major depressive disorder and anxiety. Id. She assessed Resendes' GAF at 67.[7] Id. Beckman opined that Resendes' "current medical condition" often impairs her ability to "engage in activities in the

---

[5] "A GAF of 41-50 represents 'serious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job).'" Konigsberg v. Astrue, 2010 WL 1794630, at *4, n.3 (D. Mass. 2010) (quoting DSM-IV at 34).

[6] A GAF score of 68 falls within the same range as a score of 70 ("mild impairment"). See supra, n.3.

[7] A GAF score of 67 falls within the same range as a score of 70 ("mild impairment"). See supra, n.3.

community." Id. Beckman noted that Resendes was able to "learn some adaptive skills to compensate [for her short-term memory problems]," that she was capable of sustaining concentration and attention for extended periods, that she could remember work-like tasks and instructions, and that she did not require excessive supervision. Id. at 431-32. Ultimately, Beckman concluded that Resendes' prognosis was "fair to good, as long as [she] is seen [at] current frequency to monitor symptoms of anxiety, depression and level of functioning." Id. at 433.

In February 2006, psychologist Nancy Keuthen, Ph.D. completed a Psychiatric Review Technique form to be used in connection with Resendes' disability hearing. Id. at 225-38. Dr. Keuthen opined that during the period from January 1, 2001 to September 30, 2001 Resendes' impairments resulting from her dysthymic disorder were not severe, and that her functional limitations in the areas of activities of daily living, social functioning, and concentration were mild. Id. at 228, 235. She noted that the evidence presented in Resendes' medical records did not establish the presence of "C" criteria.[8] Id. at 236.

---

[8] According to the SSA regulations, an impairment is considered severe if it "significantly limits your physical or mental ability to do basic work activities." 20 C.F.R.§ 404.1520(c). For a mental impairment to be categorized as severe, it must meet either the "B" or "C" criteria listed in the regulations. See 20 C.F.R. § 404, Subpt. P, Appx. 1, 12.02(A).

A mental disorder satisfies the "B" criteria if it results in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or, (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. § 404, Subpt. P, Appx. 1, 12.02(B).

A claimant can satisfy the "C" criteria if she can demonstrate a "[m]edically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) Repeated episodes of decompensation, each of extended duration; or (2) A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." 20 C.F.R. § 404, Subpt. P, Appx. 1, 12.02(C).

Apart from depression and anxiety, Dr. Caldas' treatment notes also contain a notation dated June 21, 2001, which indicate that a doctor at another office had prescribed Resendes Seroquel "as needed" at bedtime, because she had difficulty falling asleep due to "obsessive [] compulsive tendencies." Id. at 457. One other physician, to whom Resendes was referred for an MRI, noted that Resendes was prescribed Prozac for "obsessive tendencies," but otherwise that condition is not discussed anywhere else in the record. See id. at 98.

At the administrative hearing, Resendes explained that because of her depression, some days she doesn't feel like getting out of bed, and her husband has to "push" her to get up. Id. at 831. She claimed that due to her depression and anxiety she avoids crowds and social activities. Id. During the hearing, the ALJ also heard testimony from an impartial medical expert, psychiatrist John Ruggiano. Id. at 836-40. Dr. Ruggiano concluded, based on his review of Resendes' medical records, that Resendes suffered from anxiety and depression. Id. at 838. He opined that these symptoms derived from her "complicated medical illness." Id. at 839. He told the ALJ that Resendes' psychological condition, standing alone, did not meet or equal any of the listings of impairments included in the SSA regulations, because the reports upon which he based his opinions described Resendes' functioning as "high," with GAFs of 70 and 67. Id. With respect to these GAF scores, Dr. Ruggiano commented, "it doesn't look like [Resendes' psychiatrists] are making too much out of the severity of it." Id. at 838.

Dr. Ruggiano stated that Resendes' claimed difficulties with remembering and concentrating were not organic - that is, due to brain tissue loss - but were the result of "pseudo-dementia." Id. at 839. Expounding on his diagnosis of pseudo-dementia, he explained that, "[Resendes] is distracted by symptoms of. . . . [her] medical condition. And when a person is

distracted they don't pay attention, therefore they don't remember." Id. Dr. Ruggiano hypothesized that Resendes' mental symptoms could be secondary to her physical illness, her depression, the medications she was taking, or possibly even to the chronic pain she experienced over many years. Id. at 839-40.

**B.      The ALJ's Decision**

The ALJ followed the standard five-step process to determine whether Resendes was eligible for disability benefits. The process requires the ALJ to decide, based on substantial evidence: (1) whether the claimant has shown she was not currently performing any "substantial gainful activity" during the relevant period; (2) whether the claimant's impairment is severe and meets the duration requirement; (3) whether the impairment meets or equals a listed impairment contained in the regulations, so as to constitute a *per se* disability; (4) if the claimant's impairment does not meet or equal a listed impairment, whether it leaves her with the residual functional capacity ("RFC")[9] to perform her past work; and (5) whether the claimant is able to perform other work of the sort found in the national economy. 20 C.F.R. § 416.920(a)(4). The plaintiff bears the burden of proof during the first four steps; at the fifth, the burden shifts to the SSA. See, e.g., Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).

At the first step, the ALJ found that Resendes had not engaged in substantial gainful activity during the period from January to September 2001. Id. at 15.

---

[9] The SSA regulations define a claimant's RFC as "the most that [the claimant] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1). As the ALJ explained in his opinion, "[a]n individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments." A.R. at 14.

At the second step, the ALJ found that several of Resendes' impairments were severe, but decided that others were not. Specifically, he found that Resendes' headaches, residual effects of her right ankle fracture, right shoulder and neck pain, and arthritis of her hands were severe impairments because they significantly affected her ability to engage in basic work related activities. Id. Meanwhile, the ALJ found that Resendes' mental impairments - - including her depression, anxiety, memory, and attention problems - - were not severe impairments, because they did not satisfy either the "B" or "C" criteria as required by SSA regulations.[10] Id. at 16. The ALJ found that while Resendes was suffering from depression and anxiety, all of her mental status evaluations consistently reported that her functioning was not severely impaired. Id. at 17. He assigned significant probative weight to Dr. Ruggiano's testimony, Dr. Sullivan's 2005 report, Dr. Meadow's 1999 neuropsychological evaluation, Beckman's treatment notes from February 2003 to November 2005 and her 2006 report based on the same, Dr. Bard's 2005 evaluation, and Dr. Pollak's 2006 neuropsychological evaluation. Id.

Specifically, the ALJ noted that both Dr. Ruggiano and Dr. Meadows opined that Resendes' memory was "in the average range." Id. He wrote that both Dr. Ruggiano's testimony and Dr. Pollak's evaluation revealed that while Resendes experienced difficulties in cognitive functioning, those impairments were "mild in severity." Id. He also referred to Dr. Sullivan's assertion that Resendes had no concentration limitations. Id. He noted that Dr. Sullivan and social worker Beckman indicated that Resendes had a GAF of 70 and 67, respectively, both of which are "consistent with mild impairment of social and occupational functioning that would include her ability to concentrate and persist at tasks or tolerate ordinary

<hr />

[10] See supra, n.9.

work pressure." Id.  Finally, the ALJ commented that in February 2006, the "nonexamining state agency physician" found nonsevere mental impairments, mild restrictions, no evidence of decompensation, and no abnormal "C" criteria.  Id.  The ALJ noted that the only outlier was the assessment made at the CFS crisis stabilization unit, which assigned Resendes a GAF of 50 upon admission.  Id.  He gave this evaluation "less probative weight" because it was made after the period of January 1, 2001 to September 30, 2001,[11] and because it was inconsistent with the record as whole.  Id.

At the third step, the ALJ found that those impairments that he did find severe nonetheless did not meet or equal any of the impairments listed in Appendix 1, Subpart P, Regulation No. 4.  Id. at 17-18.  He explained that he had compared Resendes' ankle, shoulder, and neck problems, as well as the arthritis in her hands, to several different impairment categories listed in the regulations, including 1.02 - major dysfunction of joints, 1.03 - reconstructive surgery of a major weight bearing joint, and 1.04 - disorders of the spine, but concluded that none of her impairments satisfied the criteria for these listings.  Id.  Significantly, the ALJ's findings at Step Three did not address Resendes' headaches, even though at Step Two he found that they constituted a severe impairment.

Because Resendes' impairments did not qualify as a disability *per se* at Step Three, the ALJ made an assessment of the Resendes' RFC to be used at Steps Four and Five in determining whether Resendes was capable of performing her past work or other work.  When assessing Resendes' RFC, the ALJ relied on the disability assessment of Dr. Schaff, the state agency

---

[11] Note that nearly all of the reports to which the ALJ assigned significant probative weight to support his finding that Resendes' physical impairments were severe were also created after the period of January 1, 2001 to September 30, 2001.  See A.R. at 15-16.  However, those reports were at least retrospective to the relevant period.

physician, and adopted her findings.[12] Id. at 20.  The ALJ explained that he gave significant

probative weight to Dr. Schaff's assessment because it was consistent with the record and was

"not contradicted by a competent, well supported, function capacity assessment from a treating

source."  Id. at 20.

Based on his RFC assessment, at the fourth step, the ALJ found that Resendes was able

to perform sedentary work, but not to perform her previous job.  Id. at 18-21.  Finally, at the fifth

step, the ALJ concluded, based on Medical-Vocational guidelines, that Resendes was not

disabled because, in light of her RFC, age, education, and work experience, she could do other

sedentary work in jobs that existed in significant numbers in that national economy.  Id. at 21-22.

He also determined that Resendes' additional exertional and nonexertional limitations would

have "little or no effect on the occupational base of unskilled sedentary work" she could

perform.  Id. at 22.

## III.    STANDARD OF REVIEW

This Court has the authority to review the Commissioner's decision to deny SSDI

benefits pursuant to Section 405 of the Social Security Act.  See 42 U.S.C. §405.  In conducting

a plenary review as permitted by Section 405, the Court may disturb the Commissioner's

decision only if he made a legal or factual error.  Sullivan v. Hudson, 490 U.S. 877, 885 (1989).

The Commissioner's factual findings are conclusive if supported by "substantial evidence."  42

U.S.C. § 405; see also Richardson v. Perales, 402 U.S. 389, 401 (1971).

The Supreme Court has defined substantial evidence to be "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  Richardson, 402 U.S. at 401

---

[12] See infra, Part III-A(3).

(quoting Consol. Edison Co. v. NLRB, 205 U.S. 197, 229 (1938)). To determine whether the Commissioner's decision was supported by substantial evidence, the Court must review the record as a whole. Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). Although the claimant has the burden of proof and production from Steps One through Four of the sequential analysis, the Commissioner and ALJ also share in the duty to "develop an adequate record from which a reasonable conclusion can be drawn." Heggarty v. Sullivan, 947 F.2d 990, 997 (1st Cir. 1991) (quoting Carrillo Marin v. Sec'y of Health & Human Servs., 758 F.2d 14, 17 (1st Cir. 1985)).

A decision may be supported by substantial evidence "even if the record arguably could justify a different conclusion." Rodriguez Pagan v. Sec'y of Health & Human Serv., 819 F.2d 1, 3 (1st Cir. 1987). However, an ALJ's findings are not conclusive when they were derived by "ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999). It is within the purview of the ALJ, and not the reviewing court, to weigh conflicting evidence, assess the credibility of witnesses, and make an ultimate determination of disability. See Rodriguez, 647 F.2d at 222. The ALJ's judgments on such matters should be given substantial deference, provided that his opinion clearly states specific reasons for reaching his conclusion. Becker v. Sec'y of Health & Human Servs., 895 F.2d 34, 36 (1st Cir. 1990); Larlee v. Astrue, 694 F. Supp. 2d 80, 84 (D. Mass. 2010). And yet an ALJ is not required to "expressly refer to each document in the record, piece-by-piece." Rodriguez v. Sec'y of Health & Human Serv., 1990 WL 152336, at *1 (1st Cir. 1990).

## IV. DISCUSSION

On appeal from the Commissioner's decision, Resendes presents two main arguments: (1) the ALJ erred in finding that her mental impairments were not severe; and (2) the ALJ's RFC assessment is not supported by substantial evidence because it was based in part on a flawed credibility determination, and on a record that was not adequately focused on the relevant time period of January 1, 2001 to September 30, 3001.[13]  As I will explain, both of Resendes' arguments have merit.  The ALJ erred in determining that Resendes' mental impairments were not severe because he improperly weighed certain medical reports and test results.  The ALJ's RFC assessment is flawed because it was based in part on a finding that Resendes' testimony was not credible enough to be incorporated into the RFC assessment.  Yet the ALJ failed to articulate an accurate and logical reason for his determination that Resendes' testimony was not credible.  It is also flawed because the record did not contain sufficient evidence from which the ALJ could draw reasonable conclusions as to Resendes' RFC during the relevant time period of January 1, 2001 to September 30, 2001.  The ALJ's RFC assessment is inconclusive for a third reason: it does not take into account the impact of Resendes' headaches on her ability to work, despite the fact that these headaches were found to be a severe impairment.

### A. The ALJ Erred At Step Two In Failing To Find That Resendes' Mental Health Problems Were Not A Severe Impairment.

At Step Two of the sequential process for determining eligibility for SSDI benefits, the ALJ must determine whether the claimant has "medically determinable" impairments that, taken

---

[13] Resendes also argues that the ALJ erred at Step Five of the sequential evaluation process in deciding that, based on Resendes' RFC, there are jobs that exist in the national economy that she can perform.  Pl.'s Br. 14-15.  Since I find that the ALJ's RFC assessment was flawed even prior to Step Four (as will be discussed below), it is unnecessary to address the merits of Resendes' argument concerning the ALJ's application of the RFC at Step Five.

individually or collectively, are "severe."  Hernandez v. Astrue, 2010 WL 4117186, at *8 (D.R.I. 2010); Social Security Ruling ("SSR") 96-3p, 1996 WL 374181, at *1 (July 2, 1996).  SSA regulations stipulate that an impairment is severe if it "significantly limits your physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  At Step Two, the severity determination is considered to be a low threshold intended to screen out only groundless claims "where medical evidence establishes only a slight abnormality . . . which would have no more than a minimal effect on an individual's ability to work . . ."  Barrientos v. Sec'y of Health and Human Servs., 820 F.2d 1, 2 (1st Cir.1987) (per curiam); see also Ramos v. Barnhart, 60 Fed. App'x. 334, 336 (1st Cir. 2003).

For a mental impairment to be categorized as severe, it must meet either the "B" or "C" criteria listed in the regulations.[14]  See 20 C.F.R.  § 404, Subpt. P, Appx. 1, 12.02(A).  A mental disorder satisfies the "B" Criteria if it results in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or, (4) repeated episodes of decompensation, each of extended duration."  20 C.F.R. § 404, Subpt. P, Appx. 1, 12.02(B).  Mental disorders satisfying the "C" criteria are organic (as opposed to affective) in nature, and are marked by decompensation.  See 20 C.F.R. 404, Subpt. P, Appx. 1, 12.02(C).

In his decision, the ALJ asserted that all the medical reports are in agreement that Resendes' mental illness and cognitive difficulties were not severe enough to satisfy the "B" criteria.  A.R. at 16-17.  He also cited several reports stating that Resendes did not exhibit any "C" criteria.  Id.  Specifically, he assigned substantial probative value to the reports of Dr.

---

[14] See n. 8, infra Part III-B.

Sullivan and social worker Beckman.  Id. at 17.  The only aspect of these reports that he highlighted were the GAF scores (67 and 70, respectively), which he categorized as "consistent with mild impairment of social and occupational functioning that would include her ability to concentrate and persist at tasks or tolerate ordinary work pressure."  Id. at 17.

A GAF score is only a "*subjective* determination based on…the *clinician's judgment* of the individual's overall level of functioning."  Magee v. Astrue, 2010 WL 2483803, at *8, n.18 (D.R.I. 2010) (emphasis added).  The GAF is a diagnostic tool developed by an association of medical professionals; it was not intended to be a yardstick for measuring disabilities within the scope of the Social Security Act.  See id. at *7-8.  It is the ALJ - not the doctor opining as to the claimant's GAF - who is to weigh the evidence and make an ultimate finding on disability.  See id.; Rodriguez, 647 F.2d at 222.  Thus, the ALJ erred in concluding that Resendes' emotional and cognitive issues were not a severe impairment at Step Two because he applied the improper standard for evaluating severity.  Specifically, he over-relied on GAF scores as an expression of Resendes' ability to work rather than considering whether her mental illness and cognitive difficulties constituted more than a "slight abnormality."  See Barrientos, 820 F.2d at 2.

In placing too much reliance on GAF scores, the ALJ failed to consider the record as a whole.  As explained above, the ALJ must weigh the evidence in its totality.  Rodriguez, 647 F.2d at 222.  Resendes' GAF scores, when read within the context of her entire medical record (or even just within the context of the reports providing the scores) demonstrate that Resendes suffered from more than a "slight abnormality," and that her mental health problems were certainly severe enough to surpass the low threshold established at Step Two.  For example, Dr. Meadows' report, to which the ALJ assigned significant probative weight, stated that Resendes'

intellectual abilities were well below average, and that her test performance on auditory and spatial attention spans was in the "low average range." Id. at 120.

While several of the doctors found that Resendes' memory was average, a fair reading of the record demonstrates that her depression and cognitive impairments could be causing her to exhibit symptoms similar to memory deficits. Dr. Meadows found "prominent difficulties" in executive functioning and integration of visual information. Id. Dr. Pollak linked these difficulties to memory, noting: "It is likely that attentional and executive functioning difficulties within her daily life are serving to account for her perceived memory difficulties." Id. at 450. At the administrative hearing, Dr. Ruggiero reiterated that depression and anxiety can produce "pseudodementia," which may cause a patient to be too distracted by mental illness to properly take in and process information or concentrate in the workplace. Id. at 839.

Moreover, Dr. Bard, the physician retained by the state disability agency to examine Resendes, reported in 2005 that she suffered from "moderate to severe impairments" in her memory. Id. at 223. However, the ALJ did not discuss this finding in his opinion, despite the fact that he gave significant probative weight to Dr. Bard's report. Id. at 17. An ALJ may not ignore relevant evidence, "especially evidence that supports a claimant's cause." Rasmussen-Scholter v. Barnhart, 2004 WL 1932776, at *10 (D. Mass. 2004). Because Dr. Bard's report, as well as the other evidence mentioned above, detracts from the weight of the ALJ's opinion, the ALJ should have explained why he was not persuaded by this evidence. Diaz v. Sec'y of Health & Human Servs., 791 F. Supp. 905, 912 (D.P.R. 1992). In sum, the ALJ over relied on GAF scores when determining the severity of Resendes' mental impairments; the record as a whole indicates that Resendes suffered from more that slight abnormalities in mental health. Thus the

ALJ erred in concluding that Resendes' mental health problems were not severe. I find that the ALJ's conclusion that Resendes' mental problems were not severe was based on insufficient evidence.

**B.     The ALJ's RFC Assessment Is Not Supported By Substantial Evidence**

In order to assess, at Steps Four and Five, whether the claimant was capable of performing his or her past or other work during the relevant time period, the ALJ must make findings as to the claimant's physical abilities during that period by assessing his or her RFC. 20 C.F.R. § 404.1520(a)(4). The ALJ must complete the RFC assessment based on "all the relevant medical and other evidence in [the] case record." 20 C.F.R. § 404.1520(e). This includes the claimant's testimony and evidence pertaining to even those impairments that the ALJ determined are not severe or do not meet or equal an impairment listed in the regulations. 20 C.F.R. § 404.1520(e); SSR 96-8p, 1996 WL 374184, at *1-2 (1996); see also Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 28 (1st Cir. 1986).

As Resendes points out, in the present case, the ALJ's opinion is not supported by substantial evidence because: (1) As a threshold issue, it does not appear that the administrative record contained sufficient evidence from which the ALJ could make reasonable findings as to Resendes' abilities during the relevant time period of January 1, 2001 to September 30, 2001; and (2) the assessment excluded any consideration of Resendes' testimony, finding that her testimony was not credible, without providing specific and logical reasons to support the adverse credibility finding. And although Resendes does not present this argument herself, it is also strikingly clear that the RFC assessment is flawed because: (3) it clearly does not take into consideration the impact of Resendes' headaches on her ability to work, despite the fact that the

ALJ found that her headaches constituted a severe impairment at Step Two.

**1.    The Medical Record Does Not Contain Sufficient Evidence Relating to the Relevant Time Period**

As explained above, Resendes has the burden of proving that she was disabled at a time prior to her date last insured, September 30, 2001, a time that she marks as beginning on January 1, 2001. 42 U.S.C. § 423(d)(1)(A); <u>Coughlin</u>, 2010 WL 4225380, at *2. Thus, the relevant time period for which the ALJ had to assess Resendes' RFC was the time between January 1, 2001 and September 30, 2001. The ALJ was required to complete this assessment on the basis of the record as a whole. 20 C.F.R. § 404.1520(e). When the evidence "lacks precision and focus in light of the narrow relevant time period," an ALJ may use evidence from the surrounding time periods to draw conclusions regarding the relevant time period. <u>Carillo Marin</u>, 758 F.2d at 16 (citing <u>Suarez v. Sec'y of Health & Human Servs.</u>, 740 F.2d 1, 1 (1st Cir. 1984)). This is permitted because and ALJ is "simply not at liberty to substitute his own impressions of an individual's health for uncontroverted medical opinion." <u>Id.</u>

There must be "an adequate record from which a reasonable conclusion can be drawn." <u>Heggarty</u>, 947 F.2d at 997 (quoting <u>Carillo Marin</u>, 758 F.2d at 17). Even though the burden of production is on the claimant from Steps One through Four, the Secretary and ALJ nonetheless have a duty at Step Five to ensure that an adequate record is built. <u>Id.</u> As the First Circuit has explained:

> Due to the non-adversarial nature of disability determination proceedings… the Secretary has recognized that she has certain responsibilities with regard to the development of evidence and we believe this responsibility increases in cases where… the claim itself seems on its face to be substantial, where there are gaps in the evidence necessary to a reasoned evaluation of the claim, and where

> it is within the power of the administrative law judge, without undue effort, to see that the gaps are somewhat filled as by ordering easily obtained further or more complete reports or requesting further assistance from a social worker or a psychiatrist or key witness.

Currier v. Sec'y of Health, Educ. & Welfare, 612 F.2d 594, 598 (1st Cir. 1980); see also 20 C.F.R. § 404.1545(a)(3).

In the present case, the evidence certainly "lacks precision in focus in light of the narrow relevant time period." Carillo Marin, 758 F.2d at 16. Out of the numerous documents on record, only a handful were created during the time between January and September 2001, namely: the treatment notes regarding Resendes' visit to the emergency room at St. Luke's Hospital, which diagnosed with acute gastroenteritis (A.R. at 347-49); the treatment notes from Resendes' follow-up visit regarding the status of her foot and ankle following a 1999 surgery, which indicate that Resendes was doing "quite a bit better" (A.R. at 712); and, the treatment notes from Resendes' primary care physician, Dr. Caldas, which report that Resendes complained of severe pain and stiffness in her hands, and contain a vague note that a doctor at another office prescribed Resendes a sleep aid for her "obsessive compulsive tendencies" (A.R. at 457). Even taken together, this body of evidence does not provide enough information to draw conclusions about Resendes' RFC during the relevant time.

Moreover, the remaining medical documentation compiled before and after the relevant time period also does not provide sufficient information for the ALJ to determine whether the ailments Resendes suffered in earlier or later years were likely present in 2001. First, several of the reports created for the administrative hearing only address Resendes' capabilities at the time of the hearing. For example, the report of social worker Beckman opines as to Resendes'

"*current* mental status." A.R. at 431 (emphasis added). Similarly, Dr. Bard's 2005 report, which states that "*at present time*, [Resendes] appears to be suffering from a depressive and an anxiety disorder." Id. at 223 (emphasis added). Second, even those reports that attempted to estimate Resendes' capabilities during the relevant time period are not thorough enough to be relied for the RFC assessment. One of these reports was completed by a non-examining, non-testifying psychologist, Dr. Keuthen, and provides too cursory a basis upon which to rest a finding that the claimant was not disabled. See Johnson v. Astrue, 597 F.3d 409, 412 (1st Cir. 2009). The other report was filed by one of Resendes' treating psychiatrists, Dr. Sullivan, but it was written in 2005 based on treatment notes from 1992 to 2001; evidently these treatment notes could not help Dr. Sullivan write an complete report, as she responded "do not know," "not to my knowledge," or "unknown" to eight of the sixteen questions on the form. A.R. at 137-39.

Finally, the treatment notes in the record reveal that Resendes' symptoms fluctuated too broadly for the ALJ to make a reasonable inference as to their status during the narrow period of January 1 to September 30, 2001. With respect to Resendes' physical ailments, for example, the records indicate that Resendes foot was in "excellent" condition in 1999, swollen and painful in 2000, "quite a bit better" in 2001, and painful in 2002. Id. at 156, 705, 712. Similarly, with respect to Resendes' emotional problems, Dr. Beckman's treatment notes indicate the Resendes' GAF potentially changed from 50 to 68 during the course of just one day. Id. at 174. I therefore find that the ALJ's RFC assessment was not supported by substantial evidence because the medical documentation could not support reasonable conclusions as to Resendes'

physical capabilities during the relevant time period.[15]

### 2. The ALJ Did Not Adequately Support His Finding That Resendes' Testimony Was Not Credible

The First Circuit recognizes that "[t]here are situations in which an individual's alleged [] reported symptoms, such as pain, suggest the possibility of a greater restriction of the individual's ability to function than can be demonstrated by objective medial findings alone." Avery, 797 F.2d at 28. In such cases, when assessing a claimant's RFC, the ALJ must consider not only objective medical evidence, but also "all avenues presented that relate to subjective complaints" – in particular, the claimant's testimony. Id. The ALJ must "direc[t] specific inquiries about the pain and its effects to the claimant," particularly regarding matters such as:

- The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

- Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

- Type, dosage, effectiveness, and adverse side-effects of any pain medication;

- Treatment, other than medication, for relief of pain;

- Functional restrictions; and

- The claimant's daily activities.

Id. at 29.

---

[15] As will be discussed below, the ALJ did not consider Resendes' testimony in making his RFC assessment. However, even if the ALJ did do so, her testimony was not sufficiently illuminating to compensate for the dearth of medical documentation regarding the relevant time period. Resendes' professed memory difficulties complicated the inquiry into whether she was disabled prior to her DLI. Instead, Resendes testified as to her physical capabilities at the time of the hearing on June 5, 2007 - - over six years after the relevant time period. On his part, the ALJ failed to fill the holes in the administrative record during his opportunity to speak with Resendes at the administrative hearing, because he did not attempt to focus the testimony on her condition in 2001.

An ALJ's determination as to a claimant's credibility regarding these matters is entitled to deference because it is the ALJ who "observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence." Frustaglia v. Sec'y of Health and Human Servs., 829 F.2d 192, 195 (1st Cir. 1987) (citing DaRosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986). However, this does not mean that an ALJ is free to accept or reject the claimant's subjective complaints solely on the basis of such personal observations. Avery, 797 F.2d at 29. Instead, the ALJ must thoroughly discuss and analyze the objective medical and nonmedical evidence, and "provide a resolution of any inconsistencies in the evidence as a whole and set forth a logical determination of the individual's capacity to work." Id. The ALJ's decision "must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7P, 1996 WL 374186, at *4 (July 2, 1996); see also DaRosa, 803 F.2d at 26.

In the present case, Resendes' testimony concerning her daily activities and restrictions did not paint a picture of a woman who is likely to hold down a sedentary job. However, the ALJ wrote that the symptomology Resendes depicted was "not of sufficient severity or credible." A.R. at 19. The ALJ's opinion then proceeds to *list* the Avery factors for analyzing a claimant's subjective complaints, but forgoes the necessary second step of analyzing the facts directly. As this Court has explained, "[i]t is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator to simply recite the factors that are

described in the regulations for evaluating symptoms." Spagnola v. Astrue, 2010 WL 4181162, at *6 (D. Mass. 2010).

Certainly, in conducting a review of the Avery factors, an ALJ need not "expressly refer to each document in the record, piece-by-piece." Rodriguez, 1990 WL 152336, at *1; see also Frustaglia, 829 F.2d at 195; Costa v. Astrue, 2010 WL 4365868, at *9 (D.N.H. 2010). However, in this case, the ALJ did not identify *any* specific inconsistencies he noted between Resendes' testimony and the objective medical evidence, let alone articulate why he resolved the inconsistencies against her favor. The ALJ's opinion is at most suggestive of his thought process: His conclusory finding on Resendes' credibility is followed by a list of medical reports that found only mild limitations - - implying that her testimony was not credible because it was inconsistent with her medical evaluations. This broad implication that the medical record belies Resendes' testimony does not constitute a "sufficiently specific" rationale for the ALJ's decision.[16]

In sum, this is not a case in which the ALJ simply could have been more explicit in "connecting the dots" of his credibility finding, the reasons for which seem plain on a review of the record. Shaw v. Sec'y of Health & Human Servs., 1994 WL 251000, at *5 (1st Cir. 1994); see also Rasmussen-Scholter, 2004 WL 1932776, at *11. Rather, the record reflects no obvious reasons to reject Resendes' testimony. I therefore **REMAND** the case back to the agency for

_____

[16] Although an express analysis of the Avery factors is preferred, an ALJ can demonstrate that he conducted a sufficient Avery analysis if the record shows that he thoroughly inquired into the Avery factors at the administrative hearing. See Frustaglia, 829 F.3d at 195; Costa, 2010 WL 4365868, at *9; Forni v. Barnhart, 2006 WL 2956293, at *10 (D.N.H. 2006). In the present case, the hearing transcript is brief and reveals that the ALJ conducted only a cursory investigation into the Avery factors. The ALJ heard testimony only from Resendes, her husband Angelo, and Dr. Ruggiano, a psychiatric expert - there was no expert testimony about her physical ailments. Moreover, the ALJ's most exhaustive lines of inquiry concerned Resendes' earning statements and the date she was last insured, not her physical capabilities. Furthermore, even where Resendes' physical capabilities were addressed, neither the ALJ nor her attorney focused the testimony on the pertinent time period of January 1, 2001 to September 30, 2001.

further inquiry into the credibility of Resendes' subjective complaints and, if it is found that her complaints are in fact credible, a new RFC assessment.

### 3. The ALJ's RFC Determination Does Not Take Into Account Resendes' Headaches

Even if the administrative record were sufficient to support inferences as to Resendes' RFC in 2001, the ALJ nonetheless failed to take Resendes' headaches into consideration. The ALJ determined that during the relevant time period, Resendes had the RFC to:

> [P]erform a wide range of sedentary work in that she was able to lift and carry up to 10 pounds frequently and 20 pounds occasionally as well as sit for at least 6 hours in an 8 hour work day, stand and/or walk for 3-4 hours in an 8 hour work day, and occasionally push and pull with arm and leg controls, and that could be done with the further nonexertional limitations of being limited to occasional stooping, crawling, balancing, climbing, kneeling, or crouching, to occasional overhead reaching with his [sic] right arm and occasional grasping and twisting with her right hand.

Id. at 18.

The RFC assigned seems to incorporate the limitations imposed by Resendes ankle pain, neck and shoulder impairments, and arthritis of her hands - - all of which the ALJ found to be severe impairments at Step Two - - yet it does not appear to consider any limitations that might be imposed by Resendes' headaches, even though the ALJ also found these headaches to constitute a severe impairment.

The ALJ's treatment of Resendes' headaches in his opinion is puzzling. First, he completely abandons any analysis of Resendes' headaches at Step Three. Specifically, he failed to analyze whether Resendes' headaches meet or equal an impairment listed in the regulations, as he did for all of her other impairments that he found to be severe. See 20 C.F.R. §

416.920(a)(4)(iii).  If the ALJ had conducted such an analysis, and it was determined that Resendes' headaches did meet or equal a listed impairment, she would have been found disabled even without an RFC assessment or consideration of her age, education, and work experience. 20 C.F.R. § 416.920(d).

Second, even assuming that Resendes' headaches did not meet or equal a listed impairment, the ALJ's discussion of Resendes' headaches in his RFC analysis lacks sufficient explanation and seems to directly contradict his analysis of her headaches at Step Two.  His only mention of her headaches is that "the medical evidence including the notes/reports to 2003 of her treating physician Dr. Abbott, a neurologist, reflect a history of headaches, but with a normal EEG in 1992 and an MRI of her brain in October 2000 showing nonspecific abnormalities. . . . She was treated conservatively for the same."  A.R. at 19-20.  This synopsis of the medical record pertaining to her headaches does not constitute a clearly stated, sufficiently specific reason for the ALJ's apparent determination that Resendes' headaches did not impose any limitations that needed to be incorporated into her RFC.  See Larlee, 694 F. Supp. 2d at 84. Moreover, the language that the ALJ used to support his RFC assessment, which seemed to imply that Resendes' headaches were not severe enough to impose any limitations, was the *exact* same language the ALJ used to support his finding that the headaches *were* a severe impairment. See A.R. at 15.

Because the ALJ's opinion alternately fails to address Resendes' headaches or addresses them in an ambiguous fashion, the RFC assessment is not supported by substantial evidence.

## V.    CONCLUSION

The ALJ's decisions as to the severity of Resendes' mental impairments, the credibility of her testimony, and the RFC assessment were not based on substantial evidence or explained with sufficiently specific reasons.  I therefore **GRANT** Plaintiff's Motion for Order Reversing The Decision of the Commissioner (**document #13**); **DENY** Defendant's Motion for Order Affirming the Decision of the Commissioner (**document #15**); and **REMAND** the matter to the agency for further inquiry into Resendes' RFC.

**SO ORDERED.**

**Date:  February 17, 2011**        */s/ Nancy Gertner*
                                    **NANCY GERTNER, U.S.D.J.**